**STATE of Iowa, Appellant,**

v.

**Steven Paul STRATMEIER, Appellee.**

**No. 02–1522.**

Supreme Court of Iowa.

Dec. 17, 2003.

Thomas J. Miller, Attorney General, Jean C. Pettinger, Assistant Attorney General, Darin J. Raymond, County Attorney, and Amy Oetken, Assistant County Attorney, for appellant.

Jack A. Faith, Sioux City, for appellee.

CARTER, Justice.

In this appeal the State challenges a district court ruling that the results of a chemical test of a breath sample were inadmissible because the procedure used in conducting the test was not approved by the commissioner of public safety. After reviewing the record and considering the arguments presented, we conclude that the procedures for testing did comply with the approved procedures for sampling breath and that the test results should be admissible with no further foundation pursuant to Iowa Code section 321J.15 (2001).

At approximately 1:40 a.m. on March 30, 2002, Deputy Paul Betsworth stopped Steven Paul Stratmeier's white Ford pickup on Highway 75 in LeMars, Iowa. The deputy had observed him driving seventy-five miles per hour in a sixty-five-mile-per-hour zone and driving onto the east shoulder of the road two times in a half-mile stretch of road. Upon approaching the pickup, the deputy smelled a strong odor of alcohol coming from Stratmeier. His eyes were glassy and his speech slurred. The deputy asked Stratmeier back to his squad car, and as they walked to the squad car, Stratmeier's balance was noticeably poor.

In the car, the deputy asked Stratmeier if he had been drinking that night. Stratmeier admitted to drinking, but claimed he had not had a drink in over an hour. Stratmeier performed poorly on field sobriety tests, and at approximately 2:05 a.m., a preliminary breath test indicated that his blood alcohol level was .13. A second preliminary breath test indicated that Stratmeier's blood alcohol level was .14. The deputy arrested Stratmeier for operating while intoxicated (OWI).

At the jail, the deputy read Stratmeier the implied-consent advisory and requested Stratmeier's consent to a breath sample. Stratmeier consented. After a mandatory fifteen-minute observation period in

which the jailer observed Stratmeier, the deputy told Stratmeier

> he needed to take a deep breath and blow into the tube. I told him the machine has an audible tone that sounds off and lets me know if he is blowing into the tube. If he is blowing it is a continuous tone. If he quits blowing or starts sucking in, it starts to beep.

Stratmeier said he understood. The deputy then changed a disposable mouthpiece at the end of the machine and attempted to obtain a sample of Stratmeier's breath in the chamber of the DataMaster cdm.

Stratmeier blew into the mouthpiece for a short time, but the machine started beeping, which indicated that his blowing had stopped. The deputy instructed Stratmeier to "take a deep breath and blow long into the tube." Defendant gave another "short breath" and again the machine indicated that the sample was still incomplete. The deputy did not replace the mouthpiece in between defendant's two breaths. The deputy then pushed a manual override button on the machine, called the "NV" button (No Volume), and received a printout revealing that the alcohol concentration of the incomplete breath sample was .121. The defendant was charged with OWI, second offense.

We have determined that the DataMaster cdm is an approved device for gauging blood-alcohol concentration and have upheld the instructions for its use issued by the Division of Criminal Investigation Criminalistics Laboratory as required by Iowa Administrative Code rule 661–7.2 (2003). *State v. Hornik,* 672 N.W.2d 836, (Iowa 2003). The machine on which Stratmeier was tested was certified as required by Iowa Administrative Code rule 661–7.2(1). The deputy was certified to use the machine.

According to the instructions adopted by the criminalistics laboratory, in order to test a subject's breath, the DataMaster will ask a series of questions about the test subject. The questions include what the person is charged with, name, sex, date of birth, etc. The answers to these questions are put on the printout of the completed test. Next, because of a mandatory fifteen-minute suspect-observation time, the machine asks for the exact time that the test was stopped and started. Then, the officer puts a new disposable mouthpiece on the machine and instructs the subject to blow.

Once the test is started, the subject has two minutes to provide a sample. A complete sample requires approximately "[a] normal breath blown into the mouthpiece for as long as he/she can" to complete the sample. If the officer obtains a complete sample, the machine prints out three copies of the result; one for the subject, one for the county attorney, and one for the operator of the machine. The manual suggests that, "[i]f the subject fails to deliver an adequate breath sample the first time and is instructed to repeat the breath test," the officer should replace with a fresh mouthpiece.

The DataMaster may consider a breath sample incomplete for a number of reasons in which case the breath sample is not automatically processed. According to the testimony of Robert Monserrate, a criminalist for the Iowa Department of Public Safety, Division of Criminal Investigation Criminalistics Laboratory, who supervises the State's alcohol breath testing program, a breath sample would not be automatically accepted if a subject was not blowing hard enough into the machine or had not blown enough air into the machine. However, in such a situation, the instructions provide that the sample may be accepted by using the manual override device on the machine that registers the alcohol concen-

tration of the breath that was injected into the chamber of the DataMaster device.

When a subject injects a breath sample in the DataMaster, the alcohol level in his breath rises along a slope of increasing concentration. The machine will not automatically indicate that a sample is complete until the level of alcohol concentration is constant. Monserrate testified that the slope detector indicates a sample is complete when a test subject's alcohol level has peaked. Monserrate testified that "[t]he [manual] override will capture whatever sample is in the chamber at the time and what it sees is going to be valid and accurate as to what was submitted to the instrument."

Stratmeier moved to suppress the test results of the incomplete sample on two grounds: (1) the deputy improperly failed to change the mouthpiece before Stratmeier's second attempt to register on the device, and (2) acceptance of the concentration shown for the incomplete breath sample was contrary to the written directions for use of the device issued by the criminalistics laboratory. The district court, although rejecting the first ground of the motion, ordered that the test results be suppressed because the recording of the concentration of an incomplete sample was contrary to the directions promulgated pursuant to administrative rule.

### I. Scope of Review.

■ Because the principal issue involved in this appeal is one of statutory interpretation, our review is for the correction of errors at law. *Hornik*, 672 N.W.2d at 838; *State v. Stoneking*, 379 N.W.2d 352, 353–54 (Iowa 1985).

### II. Admissibility of the Chemical Test Results.

The State urges that the evidence suppressed by the district court was admissi-ble pursuant to Iowa Code section 321J.15, which provides:

> Upon the trial of a civil or criminal action or proceeding arising out of acts alleged to have been committed by a person while operating a motor vehicle in violation of section 321J.2 or 321J.2A, evidence of the alcohol concentration or the presence of a controlled substance or other drugs in the person's body substances at the time of the act alleged as shown by a chemical analysis of the person's blood, breath, or urine is admissible. If it is established at trial that an analysis of a breath specimen was performed by a certified operator using a device intended to determine alcohol concentration and methods approved by the commissioner of public safety, no further foundation is necessary for introduction of the evidence.

Stratmeier argued in the district court and that court agreed that any deviation from the procedures specified pursuant to administrative regulation for invoking the implied-consent law would require suppression of the test results. That conclusion was based on our decisions in *State v. Jensen*, 216 N.W.2d 369, 372 (Iowa 1974); *State v. Williams*, 201 N.W.2d 710, 710 (Iowa 1972); and *State v. Hraha*, 193 N.W.2d 484, 489 (Iowa 1972). At the time those cases were decided, section 321B.10 of the 1973 Iowa Code provided:

> Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while operating a motor vehicle upon a public highway of this state while under the influence of an alcoholic beverage, evidence of the amount of alcohol in the person's blood at the time of the act alleged as shown by a chemical analysis of his blood, breath, saliva or urine is admissible.

This statute did not lay down any guidelines with respect to compliance with applicable administrative regulations as a condition to admissibility of the evidence. Consequently, this court developed a rule of strict compliance on its own initiative.

Section 321B.10 of the earlier Code was replaced in 1986 by the present version of section 321J.15 (1986 Iowa Acts ch. 1220, § 15). That statute provides that a showing of compliance with administrative directives is only necessary to avoid establishing "further foundation" in the admission of alcohol-testing results. Under this statutory arrangement, unless it can be demonstrated that the test results are so unreliable as to preclude consideration, the results of a test taken by methods other than those strictly prescribed by administrative regulation are admissible. Under such circumstances, any challenge to the procedures used in obtaining the chemical test goes to the weight of the evidence rather than its admissibility.

We need not trouble ourselves in the present case with the distinction between admissibility without further foundation and admissibility based on a full explanation of the testing procedure. We are satisfied that the procedures followed in taking the sample of Stratmeier's breath fully complied with the directions that had been promulgated pursuant to administrative regulation.[1] Among the directions for use of the DataMaster promulgated by the criminalistics laboratory was the following:

SAMPLE CONTROL OVERRIDE

Refers to the fact that the operator chose to press the "NV" key when a subject, for whatever reason, was not providing an adequate breath sample per instructions. The test result is valid for the sample that was in the sample chamber at the time the operator pressed the key. Most test results obtained using this method will result in a lower than actual subject alcohol level unless the subject is alcohol free.

We believe that this provision expressly validates the use of an alcohol concentration obtained from a breath sample by the use of the manual-override device.

The portion of the administrative directions that the district court concluded were violated provided that, after analyzing a sample, the instrument would print out one of the following results:

SUBJECT REFUSED? (Y/N) Will be asked again if the instrument has been allowed to go through the 2–minute breath sampling period without a[n] adequate sample having been provided. If this question is answered with a "Y" a printout will be obtained and at that point where the results of "SUBJECT SAMPLE" are printed, the word "REFUSAL" will be printed. If this question is answered with a "N" after the test period then the word "INCOM-

---

1. The applicable administrative regulation provides:

   A peace officer desiring to perform direct testing of a subject's breath for the purpose of determining the alcohol concentration shall employ, or cause to be used, a breath testing device of a type meeting the minimum performance requirements established by [certain federal regulations]. . . .

   . . . .

   The operator of an evidentiary breath testing device shall have been certified as competent in the operation of the breath testing device, and shall proceed in accor-

dance with the instructions included in an operational checklist and operating manual furnished by the division of criminal investigation criminalistics laboratory. . . .

   . . . .

   All certifications of devices shall be made by the division of criminal investigation criminalistics laboratory. All certifications of operators shall be made by the division of criminal investigation criminalistics laboratory or a designee. A designee shall be a person trained and certified by the division of criminal investigation criminalistics laboratory.

Iowa Admin. Code r. 661–7.2(1).

PLETE" will be printed instead of "RE-FUSAL". At this point, the instrument would then return to the "READY–PUSH RUN" screen and if the subject were to be given another opportunity, the instruction will ask "USE PREVI-OUS DATA?" (Y/N) after the "RUN" key was pressed. A "Y" would allow the operator to scroll through the information entered previously to verify its accuracy and then proceed into a new opportunity for the subject to provide a breath sample.

We find nothing in the foregoing directive that is inconsistent with the express validation of the manual-override process in the agency's directions to users of the machine.

■ The trial court determined that the requirement for obtaining a new mouthpiece upon the initiation of a second or subsequent testing procedure did not apply to false starts during a single testing procedure. That was the situation involved in the present case. As a matter of practicality and common sense, we agree with the trial court's conclusion on this issue. For all of the reasons stated, we conclude that the results of chemical testing that were suppressed by the trial court are admissible without further foundation pursuant to section 321J.15. We have considered all issues presented and conclude that the judgment of the district court must be reversed. The case is remanded to that court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**